**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

KRISTY J. DOWNING,

       Plaintiff,

v.                                                                                          Case No. 11-15015

J. C. PENNEY, INC.,

       Defendant.
                                                                       /

**ORDER (1) GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND (3) DENYING PLAINTIFF'S MOTION FOR DISCOVERY SANCTIONS**

Plaintiff Kristy Downing, an attorney, represents herself in this suit arising from her experience at two different hair salons owned by Defendant J. C. Penney. She claims that employees at the J. C. Penney salons cut too much of her hair, damaged her hair and skin with a product known as hair relaxer, and, after she complained, refused to continue serving her. Downing sues J. C. Penney for racial discrimination (under 42 U.S.C. § 1981, 42 U.S.C. § 2000a, and Michigan Compiled Laws § 37.2101 *et seq.*), battery, negligence, and intentional infliction of emotional distress. Both parties move for summary judgment. Downing moves also for discovery sanctions. For the reasons stated, J. C. Penney's motion for summary judgment is granted in part, preserving Plaintiff's negligence claim, and Downing's motions for summary judgment and for sanctions are denied.

## I. THE MOTIONS FOR SUMMARY JUDGMENT

### A. BACKGROUND[1]

In early 2009 Downing began to receive a monthly hair treatment at the salon in the J. C. Penney in Canton, Michigan. During a typical treatment, Downing's stylist, Angela Powell, applied a hair relaxer, a product that straightens hair but that becomes harsh and potentially corrosive to hair and skin if not promptly and properly removed. Powell typically applied the relaxer, removed the relaxer with a neutralizing shampoo, applied a conditioner, and, finally, trimmed about half an inch of hair. Powell, like Downing, is black.

Downing found that Powell gradually became less polite during Downing's treatments. For instance, when Downing said that she believes people at the movies often move near her in order to annoy her, Powell suggested that Downing assist the putative molesters by arriving to films earlier. By the fall of 2009 Downing thought Powell generally either too inquisitive or insufficiently talkative during Downing and Powell's conversations. In Downing's words, Powell started "acting as though she was doing me a favor by doing my hair[;] [she] wasn't appreciating me patronizing the business." (Pl.'s Dep. 32, Dkt. #20-2 at 9). Besides the movie theater comment, however, Downing cites no specific example of Powell's rudeness in 2009 or the first four months of 2010.

---

[1] Because most of this order addresses J. C. Penney's motion for summary judgment, the facts are presented in the light most favorable to Downing. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648 (6th Cir. 2012).

During a treatment on March 15, 2010, Powell said little, and Downing paid little attention to Powell's work.  Although Downing had not asked for a change from the usual treatment, Powell cut three inches of Downing's hair.  Questioned by Downing, Powell denied cutting more than usual and claimed that the hair would look longer after a combing.  The record includes a blurry "before" photo, in which Downing's hair advances slightly below the ear, and a blurry "after" photo, in which Downing's hair resembles a short crop, close to a crew cut.  (Pl.'s Aff. 7, Dkt. #19-6 at 8).

Several stylists (each white) sat and talked in the reception area.  When Downing entered the reception area to pay, the stylists stared at her and whispered.  One of the stylists said something like, "Look at that."  (Pl.'s Dep. 60-61, Dkt. #20-2 at 16-17).  Downing paid, provided no tip, gathered the manager's contact information, and left the salon.  (The next day, March 16, Downing emailed the manager, who refunded Downing's payment.)  Downing claims that the stylists "were watching as if they wanted to see if I was going to notice that my hair had been cut."  (*Id.*).

Walking from the salon to the store's main entrance, Downing saw a group of about five J. C. Penney employees (most of them black) standing around a counter.  One of the black employees said, "Thank you for shopping at J. C. Penney."  (Pl.'s Dep. 68, Dkt. #20-2 at 18).  To Downing the employee's tone sounded sarcastic.  After the employee either repeated herself or wished Downing a nice day, Downing responded, "Why are you even talking to me, you know, and yelling at me while I'm exiting the store?"  (*Id.*).  The employee approached Downing and said something abrupt.  (Pl.'s Dep. 72, Dkt. #20-2 at 19) ("[The employee] said . . , 'Who do you think you're talking to?' or 'I can say whatever I want to say, as an employee,' or something to that effect.").

3

After receiving the abrupt employee's name from the manager, Downing left. Downing believes that the employees (none of whom Downing had met) knew about Downing's hair cut and "wondered what [her] response would be." (Pl.'s Dep. 73-74, Dkt. #20-2 at 20). "Before I entered the area," Downing explains, "they were all looking and staring, waiting for me to [] walk up, and were saying 'Ooh, there she is.'" (*Id.*).

Downing received one negative comment about her haircut, from her weight loss coach, who mentioned that Downing's hair looked better before. Although she continued to receive pedicures and waxings at the J. C. Penney salon in Canton, Downing switched to a different salon for hair treatment. Dissatisfied with that salon, she switched to the J. C. Penney salon in Ann Arbor in September, 2010. At the Ann Arbor salon Downing received her hair treatment from Angela Wimberly, who, like Downing, is black.

Downing again detected a creeping impoliteness in her stylist. Within a few months Downing found that Wimberly "almost acted like she felt she was doing me a favor by doing my appointment." (Pl.'s Dep. 111-12, Dkt. #20-2 at 29). Wimberly either talked too little or inquired too much. For example, during the holidays Wimberly asked whether Downing would see family. Although Downing believes a stylist should "make [a] client[] feel welcome" and should "carry on a conversation," Downing found Wimberly's question obnoxious, and she "may have" told Wimberly "not to be so inquisitive and nosy." (Pl.'s Dep. 28, 112, Dkt. #20-2 at 8, 29).

Around the time she was asked about her holiday plans, Downing noticed a bald spot by her left temple. A stylist should apply hair relaxer back-to-front so that the relaxer spends less time on the delicate hair near the front of the head. Downing

4

inferred from the bald spot that Wimberly had applied the relaxer front-to-back. When asked, Wimberly assured Downing that the relaxer is always spread back-to-front. Months later, however, during a May 27, 2011, appointment, Downing noticed Wimberly placing the relaxer front-to-back. When Downing objected, Wimberly said that she often begins applying relaxer in the front. In response Downing requested the manager's card and a new stylist to finish the session. After receiving both, she left.

The next day Downing emailed the manager, Karin Minix (who is white). The email says that Downing felt "disgusted" by Wimberly's misuse of relaxer, that Wimberly "behaved very unprofessionally," and that Wimberly displayed a "lack of integrity" as well as a "lack of dignity." (Compl. Ex. E, Dkt. #1-6). Downing sent Minix other emails and spoke to Minix by phone. During this exchange Downing repeatedly asked Minix to recommend a new stylist, but Minix hesitated. A June 16, 2011, email from Minix to Downing states, "The last time we talked I explained to you that we [] provided you with the best [stylist] possible and you were not satisfied. We [cannot] offer you a further recommendation." (Compl. Ex. F, Dkt. #1-7). Minix claims that, after investigating, she decided Downing's complaint was groundless. (Aff. Minix, Dkt. #23-2). Downing, Minix still insists, was just impossible to satisfy.

## B. STANDARD

Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute of material fact exists if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although a court must draw each reasonable inference in favor of the

non-moving party, *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003), a mere "metaphysical doubt as to the material facts" fails to establish a genuine dispute, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### C. DISCUSSION

#### 1. Discrimination

Section 1981 prohibits intentional racial discrimination in the making and enforcing of a contract, including the informal contract that enables the sale of a service such as hair styling. Because the record includes no direct evidence of discrimination, the shifting burdens first described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), govern. *Keck v. Graham Hotel Sys., Inc.*, 566 F.3d 634, 639 (6th Cir. 2009). The burden begins with Downing, who must establish a *prima facie* case of discrimination. A *prima facie* case shifts the burden to J. C. Penney, which must provide a legitimate, non-discriminatory explanation for its apparently discriminatory acts. A sufficient explanation returns the burden to Downing, who must show that the explanation is a pretext for discrimination. *Cline v. BWXT Y-12, LLC*, 521 F.3d 507, 509 (6th Cir. 2008). At each stage the burdened party must submit evidence establishing a genuine dispute. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011).

##### a. Prima Facie Case

*Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862 (6th Cir. 2001), modified the elements of a *prima facie* case to fit a Section 1981 claim against a retail store or service (although the modified elements apply also to Downing's claims under 42 U.S.C. § 2000a and Mich. Comp. Laws § 37.2302. *Christian*, 252 F.3d 862; *Keck*, 566 F.3d at 639 n.1; *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 106 (2d Cir. 2001).)

> Under this [modified] framework, to state a *prima facie* case of discrimination, [] plaintiffs must show that: (1) they belonged to a protected class; (2) they sought to make a contract for services ordinarily provided by the defendant; and (3) they were denied the right to enter into a contract for such services while similarly situated persons outside the protected class were not, or they were treated in such a hostile manner that a reasonable person would find it objectively discriminatory.

*Keck*, 566 F.3d at 639 (citing *Christian*, 252 F.3d at 872). J. C. Penney contests only the third part—whether Downing suffered dissimilar or hostile service.

Downing believes she suffered intentional discrimination at least three times: when Powell cut too much hair, whenever Wimberly applied hair relaxer front-to-back, and when Minix refused to recommend a new stylist. Nothing in the record discusses the service enjoyed by another customer, let alone by a non-black customer who received hair relaxing or who requested a new stylist after questioning the integrity of her old one.[2] Downing bases her *prima facie* case on hostility.

"Hostility" sufficient to raise an inference of discrimination includes a business's "profoundly" contravening its "manifest" financial interest, a business's acting "far outside of . . . business norms," or a business's acting in an obviously arbitrary fashion.

---

[2] To establish a *prima facie* Section 1981 claim based on the service enjoyed by an unprotected and similarly situated customer, a plaintiff must first establish that she was deprived of an equal opportunity to contract. *See Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 243 (6th Cir. 1990); *Lopez v. Target Corp.*, 676 F.3d 1230, 1234-36 (11th Cir. 2012). Although they might constitute bad service or even a tort, the unwelcome haircut and the misapplied relaxer did not frustrate Downing's attempt to contract with J. C. Penney. In both instances Downing received and purchased hair treatment. *Cf. Keck*, 566 F.3d at 640 ("[the] inference of discrimination arises where a plaintiff is *deprived* of services") (emphasis added); *Lopez*, 676 F.3d at 1234 (a plaintiff must show that she "was actually prevented . . . from making a purchase"); *see generally* 2 J. Cook and J. Sobieski, Civil Rights Actions ¶ 5.11 (2012). So even if evidence consistently showed that an unprotected, similarly situated customer enjoyed better service than Downing, only Minix's refusal to recommend another stylist might then support a *prima facie* case of discrimination under Section 1981.

*Keck*, 556 F.3d at 641. A salon with stylists who chop hair without warning and who misapply abrasive chemicals will promptly alienate customers and lose money. Powell and Wimberly's apparently irrational or arbitrary acts toward Downing could therefore constitute (under *Christian*, at least) hostility that a reasonable person should find objectively discriminatory.

Minix's declining to recommend a new stylist presents a closer question. A profit-seeking manager cannot accept without question each complaint against an employee. An unhappy employee is often unproductive, and a maligned employee is often unhappy. Said another way, forcing employees to continue serving an extraordinarily picky customer might not make business sense. The familiar phrase notwithstanding, a customer is not always right.

Minix met Downing through an email describing one of Minix's employees as unprofessional, undignified, and disgusting. If she spoke to Wimberly about the email, Minix probably learned about the difficulty of serving Downing—the sort of customer who gets offended by questions about her holiday plans. And Minix described Wimberly as the best stylist available at the Ann Arbor J. C. Penney salon. If Minix found Wimberly able and trustworthy and Downing wrong and cantankerous, Minix's refusing to recommend another stylist looks like a rational and conventional business decision. Hence a person thinking reasonably might well find Minix's "hostility" not objectively discriminatory. On the other hand, however, "the burden of establishing a *prima facie* case of discriminatory treatment is not meant to be onerous." *Christian*, 252 F.3d at 870. When described more generally as a refusal to recommend a stylist, Minix's conduct looks sufficiently irrational to establish a *prima facie* case of discrimination. *See*

8

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981) (observing that "the factual inquiry proceeds to a new level of specificity" at the *final* stage of the *McDonnell-Douglas* framework).

### b. Legitimate, Non-Discriminatory Explanation

In any case, J. C. Penney's rational business motives can arise again in the *McDonnell-Douglas* framework's next stage. Minix claims an investigation led her to conclude that no feasible level of service could satisfy Downing. That, according to Minix, is the legitimate, non-discriminatory reason why Downing received no referral. As for the bad haircut and the misapplied relaxer, J. C. Penney's counsel acknowledges that Powell and Wimberly possibly blundered. In another count Downing accuses Powell and Wimberly of negligence, so, not surprisingly, neither of them admits to a mistake. By denying they acted wrongly, however, Powell and Wimberly provide sufficient evidence to support counsel's explanation that, at worst, Powell and Wimberly each committed an honest mistake that had nothing to do with race.

### c. Pretext

The question, then, is whether Downing can show by a preponderance of the evidence that J. C. Penney's explanation is a pretext for discrimination. *See Christian*, 252 F.3d at 879. A plaintiff may establish pretext by showing that the defendant's non-discriminatory explanation is unsupported or false. *Id*.

Downing infers that Powell meant to cut a lot of hair; she infers that the stylists in the reception area were told to watch for her; she infers that the employees at the entrance were told to watch for her; she infers that Wimberly meant to apply hair relaxer incorrectly; she infers that Minix intended to slight her by providing no referral; and from

these inferences she further infers that the trio of Powell, Wimberly, and Minix discriminated against her based on her race.

During her deposition Downing spoke about why she believes the employees at the entrance were watching for her and why she believes Powell intended to cut too much hair:

> Q: So you think, at some point during the day, Ms. Powell actually spoke to these five women [at the entrance] and said, "I plan on cutting Kristy Downing's hair today, [] just you wait and see"?
>
> A: Something to that effect. I believe it was premeditated and she told other people before she did it.
>
> Q: Any idea why Ms. Powell would do something like that?
>
> A: There are a lot of possibilities.
>
> Q: Tell me what you think.
>
> A: You know, a lack of professionalism. At one point in time, in, like, 2008, I wore my hair shorter, and, perhaps, some people preferred me with a shorter haircut. And she was just going to take it upon herself to give me a shorter haircut, because a lot of—a number of people may have preferred me to wear it that way.
>
> Q: Did you ever tell her, at some point, "Yeah, everybody used to tell me that my hair looked better shorter"?
>
> A: No.
>
> Q: Okay, then how would she know that?
>
> A: I don't know how she would know that.

(Pl.'s Dep. 75, Dkt. #20-2 at 20). Stylists socializing in a reception area and employees greeting at a store entrance constitute normal events. A conspiracy among the employees in two sections of a large department store to humiliate a customer for no apparent reason constitutes a strange event. (And why would they try to humiliate the

customer by cutting her hair to a style they heard people preferred?)  Other than the self-serving claim that she heard employees say "like an 'Ooh, look at that,' kind of thing," (Pl.'s Dep. 60, Dkt. #20-2 at 16), Downing provides no evidence to support the strange event.  More importantly, no record evidence supports Downing's fanciful proposal about Powell's motive.  In each instance, Downing invites a fact finder to guess.

Proposing an alternative motive for Powell, one of Downing's briefs states that "there is [] direct evidence that Powell held racial biases as she had a history of making disparaging remarks about African-American public figures and discussing race with Plaintiff.  Ex. D., pp. 86-87."  (Pl.'s Mot. Summ. J. 20 n.14, Dkt. #19 at 24).  This statement, however, cites only the following testimony:

> Q:  Tell me about the conversations [with Powell].
>
> A:  So Ms. Powell is black, and I am black, so during our conversations race may normally have come up.
>
> . . . .
>
> Q.  How so?
>
> A:  You know, we had conversations about Kwame Kilpatrick and his fall from mayorship, whether or not it was racially motivated.
>
> Q:  And did the two of you agree on that?
>
> A:  She had a different view than me, in terms of, you know, his integrity in the position.  Things that I didn't have knowledge of.
>
> Q:  Okay.  Any other conversations you had with [Powell] that race came up?
>
> A:  I think we talked about American Idol, and whether [] race played a factor in that show.
>
> Q:  And did you agree on that?

>    A:    I'm not sure. I don't recall.
>
>    Q:    Does it?
>
>    A:    It could. It's possible. Anything is possible.
>
>    Q:    Okay. Any other conversations with [Powell] where race came up?
>
>    A:    Not that I can recall right now.

(Pl.'s Dep. 86-87, Dkt. #20-2 at 23). Downing implied that race arose in Downing and Powell's conversations for a natural and innocuous reason—shared identity. And a "history" of "disparaging remarks" about black "public figures," it turns out, means conversations in which Powell questioned one public figure's integrity. The record fails to state the content or the severity of Powell's comments. And Downing admitted she does not know whether the disparaging of the one public figure was reasonable. In other words, Downing cannot recall even one statement that suggests a "racial bias." But she invites a fact finder to guess.

Downing also never establishes a motive for Wimberly. Pressed on the issue, Downing claimed that Wimberly "felt more comfortable" harming Downing because Wimberly and Downing are both black. (Pl.'s Dep. 143, Dkt. #20-2 at 37). But Downing never challenges J. C. Penney's non-discriminatory explanation (the occurrence of a mistake) with a plausible reason why Wimberly would *want* to harm her. She invites a fact finder to guess.

Finally, Downing spoke about why she believes her race caused Minix to recommend no other stylist:

>    Q:    [Y]ou're saying that [Minix] did not [recommend another stylist] because you're African-American?

12

> A: She didn't offer me a replacement because she didn't want to make Angela Wimberly feel uncomfortable by having me come there after [Wimberly] had purposefully misapplied that relaxer[.] I would still be coming there for treatments, but it would be under somebody else, so [Minix] just figured it would be easier to push me off, rather than to either discipline Ms. Wimberly or have her suffer the embarrassment of me coming to see somebody else.

(Pl.'s Dep. 146-47, Dkt. #20-2 at 38). Nothing in this explanation enjoys evidentiary support. And, of course, none of it implicates Downing's race. Nevertheless, Downing invites a fact finder to guess. In short, Downing constructs her inferences with speculation. *See Grizell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) ("mere personal beliefs, conjecture and speculation are insufficient to support an inference of discrimination").

Downing considers herself "very easy to please." (Pl.'s Dep. 148, Dkt. #20-2 at 38). Having visited a J. C. Penney salon "58 times over [] the last three years," Downing proposes that her "track record" reveals that "she was 'satisfied' 97% of the time." (Pl.'s Mot. Summ. J. 16, Dkt. # 19 at 20). She contends that her satisfaction with all but two of the hair treatments she received shows that Minix's proffered reason for providing no referral equals a pretext.

Before the bad haircut, Downing consistently found Powell curt, nosy, and rude. (*See, e.g.*, Pl.'s Dep. 32, Dkt. #20-2 at 9) (of Powell: "[she was] acting as though she was doing me a favor by doing my hair"). Before the misapplied hair relaxer, Downing consistently found Wimberly curt, nosy, and rude. (*See, e.g., Id.* at 111-12, Dkt. #20-2 at 29) (of Wimberly: "[she] almost acted like she felt she was doing me a favor by doing my appointment"). At least one other employee left Downing dissatisfied:

> Q: Do you remember any kind of incident up at the front desk . . . ?

> A:  . . . . I remember calling in, and Danielle [a receptionist] being kind of suggestive in her language and disposition, like, borderline flirtatious, or as if she knew me on a personal level . . . . Just, like, really informal with me and almost sarcastic.
> . . . .
> Q: Okay. What, exactly, did Danielle say that made you uncomfortable?
>
> A: Her exact words, I don't recall, but I think she kind of started a conversation with me in terms of how I was doing. Maybe she asked me what was new . . . . I don't know, just very kind of wanting to be involved in what I was doing.
> . . . .
> [She] was very [] casual in her language with me. Like, "Oh, hey, Kristy," and all this kind of stuff. It's, like, I don't know her.

(Pl.'s Dep. 134-35, Dkt. #20-2 at 35). Downing seems dissatisfied more than three percent of the time.

Even if no employee told Minix that Downing was a challenge, Minix could still conclude, from the incident about which she knew, that Downing was an easily dissatisfied customer. Although much of Downing's first email to Minix constitutes an orderly complaint, the email contains several personal attacks against Wimberly. (Pl.'s Mot. Summ. J. Ex. H, Dkt. #19-9) ("I am quite disgusted by . . . her lack of integrity . . . and her lack of dignity . . . ."). The email ignores the possibility that a misunderstanding occurred and assumes that Wimberly acted in bad faith. *Id.* ("[she] lied about having received prior instruction from me to start [applying relaxer] from the back of the head"); ("when I reminded her of our past conversation she [] acted as if she did not remember it"). No customer had previously complained about Wimberly. (Pl.'s Mot. Summ. J. Ex. M, Dkt. #19-14 at 1-2). Even while noting Downing's supposed satisfaction before, Minnix could infer that Downing jumps to conclusions about character and motive and

thereby exacerbates any problem. The email allowed Minnix to assume, reasonably, that Downing was more delicate than the salon could handle.

Because no record evidence shows pretext, Downing's discrimination claims fail.

### 2. Battery[3]

Battery requires intent. *Sudul v. City of Hamtramck*, 562 N.W.2d 478, 487 (Mich. Ct. App. 1997) ("there is, properly speaking, no such thing as a negligent [battery]"); *see* 6 Am. Jur. 2d Assault & Battery § 92 (2012). A defendant must intend to touch the plaintiff in a harmful or an offensive manner. *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004); Restatement (Second) of Torts § 13 (1965).

As discussed earlier, the record fails to support Downing's beliefs that Powell intended to cut an offensively large amount of hair and that Wimberly intended to misapply hair relaxer. *See* Sec. I.C.1.c., *supra*. As Downing said, "there are a lot of possibilities" as to why Powell or Wimberly might intentionally harm Downing. But not one of those possibilities is subject to reasoned inference from the record. The battery claim fails.

### 3. Emotional Distress

---

[3] The complaint invokes diversity jurisdiction and demands $150,000. (Compl., Dkt. #1 at 2, 11). In demanding more than $75,000, Downing perhaps needed to exercise her imagination. So the record now reveals. For the purpose of determining federal jurisdiction, however, the amount in controversy at the beginning of the action governs, and, unless obviously baseless, the amount demanded by the plaintiff controls. *Klepper v. First Am. Bank*, 916 F.2d 337, 340 (6th Cir. 1990); *Sellers v. O'Connell*, 701 F.2d 575, 578 (6th Cir. 1983); 14AA C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3702.4 (4th ed.). The complaint plausibly suggested a sufficient amount in controversy. In consequence, the remaining state law claims will receive attention.

Intentional or reckless infliction of emotional distress means behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 694 (Mich. Ct. App. 2010).

Nothing in the record portrays Downing as someone suffering the effects of outrageous conduct.  Although Downing believes she suffers permanent hair loss near her left temple, no doctor agrees with her—she never sought a doctor's opinion.  Downing reports that she suffers "a certain amount of embarrassment" and that "her confidence level is a bit lower" because of her hair.  (Pl.'s Dep. 138-40, Dkt. #20-3 at 36).  But she has not visited a psychologist.  She cites no concrete manifestation of her emotional distress besides the fact that she now treats her own hair.

In any event, Downing cannot establish that Powell or Wimberly acted intentionally, never mind outrageously.  *Cf. Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991) ("plaintiff's case [for emotional distress] was considerably weaker without the assault and battery claim").  And an unwelcome but normal haircut and a clumsy but minimally harmful relaxer treatment belong with the mundane indignities that establish no claim.

### 4.  Negligence

A plaintiff suing for negligence must evidence the traditional elements of a tort: duty, breach, causation, and damage.  *Loweke v. Ann Arbor Ceiling & Partition Co., LLC*, 809 N.W.2d 553, 556 (Mich. 2011).  A salon owes a patron a duty to provide reasonable hair care as compared to a typical salon in the area.  *Smith v. Artiste Perm. Wave Shoppe*, 292 N.W. 361, 362 (Mich. 1940); 11 Am. Jur. Barbers & Cosmetologists

§ 18 (2012). Powell denies cutting too much hair and Wimberly denies misapplying hair relaxer. (Affs. Powell & Wimberly, Dkt. #23-2 at 1-2).

Downing submits "before" and "after" photographs that, although blurry, unmistakably show a shortening of Downing's hair. (Pl.'s Aff. 7, Dkt. #19-6 at 8). J. C. Penney objects that the photos "cannot be date authenticated," (Def.'s Mot. Summ. J. 16, Dkt. #19 at 16), but provides no authority suggesting that a plaintiff cannot attempt to authenticate her own photos with testimony, c*f. Weiss v. Axler*, 328 P.2d 88, 98 (Colo. 1958) (affirming the trial court's decision to allow the victim of a damaging hair treatment to authenticate her own photos). Whether Powell caused the shorter hair, whether causing the shorter hair constituted unreasonably bad hair care, and whether Downing suffered compensable damage are questions for a jury.

Downing submits photos of her left and right temples. (Pl.'s Mot. Summ. J. Ex. K, Dkt. #19-12). Maybe a small divot of missing hair appears around the left temple—a jury would need to decide. The record includes also a copy of the pertinent hair relaxer's instructions. They warn that a user should apply the relaxer "to the hairline last" and that "misuse of the product . . . can damage hair or result in permanent hair loss." (*Id.* Ex. L, Dkt. #19-13 at 2-3). A jury, believing Downing, can find that on May 27, 2011, Wimberly applied hair relaxer around Downing's hairline first. That finding, in turn, might allow an inference that Wimberly misapplied relaxer before and damaged the hair around Downing's left temple. Whether Wimberly caused hair loss, whether causing the hair loss constituted unreasonably bad hair care, and whether Downing suffered compensable damage are questions for a jury. *Cf.* 11 Am. Jur. 2d

*supra.* § 22 ("the failure to follow instructions of the manufacturer in the application of hair dye, wave solution, and the like, may [] be negligent").

## II. THE MOTION FOR SANCTIONS

Downing accuses the reporter who transcribed Downing's deposition of errors that "[do] not appear to be accidental." (Pl.'s Mot. Sanc. 2, Dkt. #25-1 at 5). Downing alleges also that J. C. Penney submitted affidavits by Powell, Wimberly, and Minix "in bad faith" and that the affidavits "are fraudulent." (*Id.* at 8, Dkt. #25-1 at 11). These serious allegations need serious evidentiary support. Downing provides none.

Downing seeks an array of sanctions, including a default judgment (*see Id.* at 6, Dkt. #25 at 9), on the ground that J. C. Penney never disclosed the Powell, Wimberly, and Minix affidavits during discovery. But the affidavits say nothing surprising. They merely deny any wrongdoing. J. C. Penney showed during discovery, in answers to interrogatories, that it planned to contest each of Downing's key allegations, and Powell, Wimberly, and Minix each appear on J. C. Penney's witness list. (Def.'s Resp. Ex. C, Dkt. #27-4); *see Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) (affirming the district court's decision to consider an affidavit not disclosed during discovery but submitted by an affiant who appeared on a witness list). Downing chose not to depose the central actors in her case. She cannot justify her surprise that they have something to say.

J. C. Penney attached Downing's deposition to its motion for summary judgment. Downing seeks to strike the deposition because J. C. Penney included no page of *errata*. Nothing, however, establishes that J. C. Penney was sent *errata* before it submitted its motion. Downing claims that the deposition is inadmissible without her

changes, but her changes appear elsewhere in the record. (Pl.'s Mot. Summ. J. Ex. D, Dkt. #19-5 at 3-4).[4] Most importantly, Downing cites no inaccuracy in her deposition that materially affects J. C. Penney's motion (or this order).

The motion for sanctions is baseless.

### III. CONCLUSION

IT IS ORDERED that Downing's "Motion for Summary Judgment" [Dkt. # 19] is DENIED and that J. C. Penney's "Motion for Summary Judgment" [Dkt. 20] is GRANTED IN PART, in that the clerk shall enter judgment for J. C. Penney and against Downing on Counts I, II, and III. J. C. Penney's motion is DENIED as to Count IV.

IT IS FURTHER ORDERED that Downing's "Motion for Discovery Sanctions Related to Defendant's Filings on Summary Judgment" [Dkt. # 25] is DENIED.

 s/Robert H. Cleland 
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: September 23, 2012

---

[4] Which is not to say that the changes are admissible. Each of Downing's proposed *errata* is either stylistic or unexplained. *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 266 (3d Cir. 2010) ("if [a] party or deponent proffering changes [to] a deposition transcript fails to state the reasons for the changes, the [] court may appropriately strike the errata sheet"); *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1305 (11th Cir. 2010) (Tjoflat, J., dissenting) ("it is not enough for the witness to give general conclusory reasons for all the changes"). Downing belatedly explains in her motion for sanctions that a few of the changes she submits fix sentences that otherwise "do[ not] make sense." (Pl.'s Mot. Sanc. 3, Dkt. #25-1 at 6). Even if a deponent says something "garbled," her desire to turn "what [s]he said" into "what [s]he meant" constitutes "a questionable basis for altering a deposition." *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 388-89 (7th Cir. 2000).

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 23, 2012, by electronic and/or ordinary mail.

                                              s/Lisa Wagner
                                              Case Manager and Deputy Clerk
                                              (313) 234-5522